NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 06-6526

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Respondent-Appellee, | ) |
| v. | ) ON APPEAL FROM THE |
| DEMETRIUS CROCKER, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE WESTERN |
| Petitioner -Appellant. | ) DISTRICT OF TENNESSEE |

**BEFORE:** KEITH and CLAY, Circuit Judges; and STEEH, District Judge[*]

**DAMON J. KEITH, Circuit Judge.** Petitioner, Demetrius Crocker, appeals from his April 13, 2006 chemical weapons-related conviction and sentence in the United States District Court for the Western District of Tennessee. For the reasons stated below, we **AFFIRM**.

On October 24, 2004, Defendant Demetrius Crocker ("Crocker") was charged with four counts of weapons-related offenses in the United States District Court for the Western District of Tennessee. Count One alleged that he knowingly attempted to acquire, receive, and possess a chemical weapon in violation of 18 U.S.C. § 229(a). Count Two charged that Crocker knowingly induced a person to acquire, transfer, and possess a chemical weapon, in violation of

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

18 U.S.C. § 229 (a)(2). Count Three alleged that Crocker received and possessed explosive weapons, which had been shipped and transported in interstate commerce, knowing and having reasonable cause to believe that they were stolen, in violation of 18 U.S.C. §§ 842(h) and 844(1). Count Four alleged that he had the knowledge and intent that these explosive materials would be used to damage and destroy a building and real property, in violation of 18 U.S.C. § 844(d). A superceding indictment on December 14, 2005 added a fifth count, alleging that Crocker possessed parts that could be readily assembled into an unregistered destructive device in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.

On April 13, 2006, a jury convicted Crocker of all counts. Judge James D. Todd sentenced him to 360 months of imprisonment to be followed by a life term of supervised release.

On appeal, Crocker claims that: (1) his motion for acquittal was improperly denied because he did not possess sufficient materials that could be "readily assemble[d]" into an explosive device; (2) he was denied an effective defense when the district court disallowed two defense witnesses from testifying on a collateral matter to corroborate his entrapment defense; (3) the diagnosis of the government's forensic psychologist was not the product of reliable principles and methods under *Daubert* and; (4) the district court improperly applied the federal sentencing guidelines in a mandatory fashion.

## I. BACKGROUND

In 2002, Crocker met Lynn Adams, a resident of McKenzie, Tennessee, and soon after began expressing his dislike of the American government and various minority groups. He

expressed admiration for Timothy McVeigh and Adolf Hitler and his hatred of Jews, Blacks, Middle Easterners, and Asians.

Crocker told Adams that he had produced nitroglycerin in the past and that he wanted to obtain materials to blow up a courthouse or a government building. Adams then contacted Steve Lee, a local drug enforcement officer, who put Adams in touch with Tennessee Bureau of Investigation officer Brian Bird and FBI agent Daryl Berry. Adams agreed to record his conversations with Crocker and work with an undercover agent named Steven Burroughs.

During the course of their recorded conversations, Adams told Crocker that he wanted to introduce him to "Steve" (Agent Burroughs), whom Adams claimed was a worker at a government facility with access to explosives and nerve gas. He also lent Crocker a military improvised munitions and explosives manual after Crocker learned that Adams had purchased the manual at a gun show.

On September 16, 2004, Adams introduced Crocker to Agent Burroughs as "Steve." Burroughs posed as a security worker at a Pine Bluff, Arkansas military facility that had access to nerve agents and other chemical weapons. Crocker and Burroughs met again on September 29, 2004. Crocker twice inquired about acquiring an agent called VX. Burroughs told him that he did not have VX, but that he had access to Diflouro, which could be mixed with alcohol to produce GB (Sarin). During the course of their conversations, Crocker also inquired about obtaining mortar rounds, grenades, and Claymore land mines.

When Burroughs informed Crocker that Pine Bluff previously stored mustard gas, Crocker explained that he had produced this agent on his own. Crocker also told Burroughs how

3

to make chlorine gas and various improvised explosive devices. He later revealed that he had expressed to Adams his interest in obtaining a dirty bomb, and that he sought to acquire C-4 as a part of this effort. Crocker stated that he wanted to take "a bunch of sorry ass government MF's down the drain" and that he "want[ed] something that do [sic] a bunch at a time, with a minimum of ease." He specifically mentioned the possibility of striking a federal courthouse.

At an October 7, 2005 meeting, Burroughs explained that he would need $500 to pay someone at Pine Bluff to remove the nerve agent from the arsenal. Crocker inquired about the amount of alcohol that would be needed to convert the Diflouro into Sarin. Burroughs also reminded Crocker of his request for mortars and hand grenades and Crocker responded, "Hell yeah, that's even better."

On October 25, 2004, Burroughs and Crocker met in an audio and video audio recorded hotel room in Jackson, Tennessee. Burroughs gave Crocker a Diflouro canister that had been filled with water. Burroughs also gave Crocker an inert block of C-4 and told him that it had been stolen. After Crocker took the C-4, the FBI takedown team entered the room and arrested Crocker. At the same time as the arrest, the FBI raided Crocker's home and found four packages of "hobby fuse," a container with black powder, a hollow hand grenade hull, and a section of galvanized pipe with an end cap attached and a cardboard insert inside.

## II. DISCUSSION

### A. Denial of Petitioner's motion for acquittal.

This Court reviews a denial of a motion for judgment of acquittal *de novo*. *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990). When evaluating a claim of insufficient evidence,

the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "'Circumstantial evidence alone, if substantial and competent, may sustain a conviction under this deferential standard of review.'" *United States v. Beverly*, 369 F.3d 516, 531 (6th Cir. 2004) (quoting *United States v. Adams*, 265 F.3d 420, 423 (6th Cir. 2001)). The granting of a motion to acquit will be confined to cases where the prosecution's failure is clear." *United States v. Keeton*, 101 F.3d 48, 52 (1996) (quoting *Burks v. United States*, 437 U.S. 1 (1978)).

Count Five alleged that Crocker possessed a destructive device not registered in the National Firearms Registration and Transfer Record. A destructive device includes "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled." *See* 26 U.S.C. § 5845(f). Defendant contends that (1) there was insufficient evidence to support the government's position that he possessed components that could be readily assembled to convert a grenade hull into a destructive device and (2) there was no evidence whether the amount of powder he possessed would have been sufficient to detonate a pipe bomb.

*1. Evidence of defendant's possession of components that could be readily assembled into a destructive device*

Petitioner's claims require us to assess whether a rational trier of fact could have found that the defendant possessed any combination of parts from which a destructive device could be readily assembled. "To qualify under statute," this Court "does not require that the destructive device operate as intended." *United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001). "It is

5

sufficient for the government to show that the device was 'readily convertible' to a destructive device." *Id.*

The FBI Bomb Technician who searched the defendant's house found hobby fuse, a container of black powder, an empty hand grenade hull, and a section of galvanized pipe with an end cap attached and a cardboard insert inside. An explosives expert testified that the grenade could be assembled into a destructive device using black powder and the hobby fuse with the addition of scotch tape, an auto body filter, or a bolt to plug the hole at the grenade's base. He also found that the galvanized pipe with the single end pipe could be made into an explosive device using tape at the end.

Although the government did not introduce evidence that the defendant possessed tape, this Court does not require showing possession of all commonly available materials when determining whether a destructive device could have been readily assembled. In *Langan*, for example, this Court found that showing possession of pliers was unnecessary to demonstrate a device was readily convertible when pliers could have been used to solder insulated wires to a pager that was part of a detonating mechanism. 263 F.3d at 626. In *United States v. Turczyk*, we similarly held that the device in question could have been detonated by "merely connecting the two wires to any electrical source on a car." 1992 U.S. App. LEXIS 10010, at *8 (6th Cir. 1992). Showing possession of scotch tape was therefore not necessary to demonstrate that the materials were readily convertible into an explosive device. Based on the bomb technician's testimony, a rational trier of fact could have found that Crocker possessed materials that could have been readily converted into a destructive device.

6

## 2. Evidence concerning the amount of black powder defendant possessed

Petitioner also contends that although the jury was shown the size of the container of the black powder seized from the defendant, the government did not introduce evidence specifying the amount of black powder that was found. This Court, however, has not required the government to specify the amount of powder found to conclude that a device is destructive. In *United States v. Uzenski*, 434 F.3d 690, 703 (2006), we found that a pipe bomb constituted a destructive device even though "the evidence fail[ed] to establish the precise quantity of red dot powder." Although agents testified that a "substantial amount" fell out of the device and blew away, they did not specify the amount found. Still, this Court concluded that "construing the evidence in the light most favorable to the Government, a rational juror could have properly concluded that the galvanized pipe contained the quantity of red dot powder necessary to detonate it." *Id.*

In this case, the government testified that only three ounces were needed to readily convert the grenade hull into an explosive device. A reasonable jury therefore could have concluded based on the evidence, including the canister of black powder, that Crocker possessed the materials sufficient to convert the grenade hull into an explosive device.

Petitioner also claims that because the device was unassembled, the government must show the element of intent. This Court requires no such showing. In evaluating whether the government needs to demonstrate intent to use a pipe segment as part of an explosive device, we held in *United States v. Pearce*, 86 F. App'x. 919, 921 (6th Cir. 2004), that showing "intent or schemes" of the possessor is not required by statute.

7

Even if intent were required, however, the jury could have reasonably inferred intent from the defendant's statement expressing his interest in blowing up a government building, his borrowing of the military improvised explosives manual, and his statements indicating he had previously assembled explosive devices. Because a rational trier of fact could have found that the defendant possessed any combination of parts from which a destructive device could be readily assembled, the district court did not improperly deny Petitioner's motion for acquittal.

## B. Exclusion of defense witnesses called to testify against the undercover government witness.

This Court reviews district court evidentiary rulings under the abuse of discretion standard. *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006). Petitioner challenges the district court's decision not to allow testimony by two defense witnesses who were to explain why they had decided not to retain Lynn Adams for previous law enforcement positions. The defense intended to impeach Adams, one of the government's primary witnesses, by showing that he was overly aggressive during his previous tenure as a law enforcement officer, and that therefore he and the government may have been similarly aggressive in entrapping the Petitioner.

During cross-examination, defense counsel asked Mr. Adams why he had stopped working as a deputy sheriff in Gibson County in 1986. Adams testified that the sheriff under whom he worked had lost the election. Defense counsel also asked Adams why he was not hired for a position for which he applied at the McKenzie, Tennessee Police Department. Adams testified that he was unaware of the basis for that decision.

The defense then called the Gibson County Sheriff who was elected in 1986 and had

8

decided not to retain Adams. After the government objected and Judge Todd sustained the objection, defense counsel stated that the new sheriff did not retain Adams because he was "too aggressive for someone I wanted working for me." Defense counsel added that the McKenzie police chief would offer similar testimony.

The district court found that the defense sought to call the two witnesses not to contradict the testimony of Adams, but in order to introduce impermissible character evidence under Federal Rule of Evidence 404(a). The court also held that previous employers' decisions not to retain Adams twenty years earlier were not relevant, finding that Adams's aggressive behavior twenty years earlier did not mean that he acted improperly in this case.

Judge Todd did not abuse his discretion by excluding the testimony. Although defense counsel had the right to question Adams about his previous employment history, under Rule 608(b), he was prohibited from utilizing specific instances of conduct of the witness for the purpose of attacking the witness's character for truthfulness. Judge Todd also properly exercised his discretion in finding that under Rule 402, testimony regarding the reasons for Adams's failure to retain employment as a law enforcement officer was irrelevant.

Finally, "even where a district court erroneously excludes defense evidence, '[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Blackwell*, 459 F.3d at 753. Based on the overwhelming evidence against the defendant, most of which is undisputed, the exclusion of testimony regarding Adams's employment history fails to raise a reasonable doubt regarding his guilt.

9

## C. Inclusion of testimony from the government's forensic psychology expert witness.

The decision to exclude expert testimony is reviewed for abuse of discretion. *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004) citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). During the trial, the defense filed a Motion in Limine to exclude expert forensic psychological testimony by Dr. Manuel E. Gutierrez, the Bureau of Prisons psychologist who examined Crocker, in order to rebut Crocker's claim that he was unusually susceptible to entrapment.

Under Federal Rule of Evidence 702, federal courts must determine whether expert testimony is reliable before it can be admitted. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

In *Daubert*, the Supreme Court "identified factors that a court may consider in determining whether an expert's testimony is sufficiently reliable, including (1) whether a theory or technique can be or has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community." *Mike's Train House*, 472 F.3d at 407 (citing *Daubert*, 509 U.S. at 593-94).

The district court conducted a *Daubert* hearing to assess the reliability of Dr. Gutierrez's testimony. In so doing, the court considered testimony from Dr. Fred Steinberg, the forensic psychology expert witness the defense called to impeach Dr. Gutierrez. Dr. Steinberg, while

criticizing some of Dr. Gutierrez's testing methods, including the use of the K-Bit intelligence test, admitted during cross-examination that he used many of the same tests and reached many similar conclusions. For example, while the two used different IQ tests, Dr. Gutierrez determined that Crocker had an IQ of 84, whereas Dr. Steinberg found that he had an IQ of 85. While Dr. Gutierrez found that Crocker was "malingering" and feigning on four scales, Dr. Steinberg found that he was "faking bad" and feigning on three scales.

Judge Todd found that the *Daubert* hearing revealed differing professional opinions, but did not indicate any failure in reliability. He observed that the two experts also reached very similar conclusions. Judge Todd therefore refused to exclude Dr. Gutierrez's testimony.

Although the two experts had some differences of opinion, there is nothing in the record to indicate that Dr. Gutierrez's methods - similar to those used by Dr. Steinberg - were unreliable. Dr. Steinberg, in fact, conceded during cross-examination that Dr. Gutierrez's practice was more specific to criminal cases because of his experience working with prison inmates. Because we agree with Judge Todd's finding that the discrepancy in expert testimony does not stem from unreliable testing procedures, we hold that the trial court did not abuse its discretion by allowing Dr. Gutierrez's testimony.

## D. Reasonableness of Sentence.

This Court reviews sentencing decisions for reasonableness. *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). Factual findings are reviewed for clear error and conclusions of law are reviewed *de novo*. *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005).

11

The defendant alleges that his sentence of 360 months was both procedurally and substantively unreasonable. The defendant had argued for a sentence of 240 months. This Court has held that a sentence may be procedurally unreasonable "if the district judge fails to consider the applicable guidelines or fails to consider the factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *Collington*, 461 F.3d at 808 (internal citations omitted). A sentence may be substantively unreasonable "when the district court select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent factors or giv[es] an unreasonable amount of weight to any pertinent factor." *Id.* (internal citations omitted).

In this case, the district court considered both the guidelines and the § 3553(a) factors. While considering the guidelines, Judge Todd found that under U.S.S.G. § 2M6.1(a)(1)(A), the offense level for knowingly attempting to acquire, receive, and possess a chemical weapon in violation of 18 U.S.C. § 229(a) was 42 because "the offense was committed with intent to injure the United States." If, as the defendant argued, the offense "involved a threat to use . . . a chemical weapon . . . but did not involve any conduct evidencing intent or an ability to carry out the threat," under U.S.S.G. § 2M6.1(a)(4)(B), the offense level would have been 20. An offense level of 42 carries a sentence of 360 months to life in prison.

Judge Todd applied Section 2M6.1(a)(1)(A) based on evidence that Crocker had the intent of using the material he attempted to acquire. He cited the defendant's statements to Lynn Adams and Agent Burroughs expressing his interest in obtaining materials to build a bomb and to blow up a courthouse or another government building. The defendant also stated during the investigation that he was unconcerned that executing an attack would cause collateral damage to

12

children and civilians. The court additionally found that Crocker had the ability to carry out these threats, citing his acquisition of C-4 explosives and his attempt to acquire Sarin from the undercover agent.

The district court then considered the factors listed under 18 U.S.C. § 3553(a), which include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the sentencing range established; (5) any pertinent policy statement issued by the sentencing commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Judge Todd noted that he was troubled by Crocker's comments demonstrating a lack of concern for civilian life as well as his statements in support of Timothy McVeigh, Terry Nichols, and Adolf Hitler. Although he acknowledged that Crocker was caught before he was able to execute an actual attack, Crocker's statements indicated that he intended to inflict harm against a civilian target.

Judge Todd then considered Crocker's criminal history. Although Crocker had no criminal record, he cited the defendant's recorded admission during the investigation that he had been involved in a drive-by shooting of a local judge who he considered a "Negro sympathizer" and a "woman sympathizer." Based on this evidence, the district court found that even though the defendant had suffered from depression and was easily persuaded, his crime was not out of character, and may have actually been consistent with his prior behavior.

13

Finally, the district court considered the deterrent effect of the sentence, and Judge Todd concluded that imposing a lighter sentence would send a negative message to those wanting to use chemical weapons and explosive devices against civilian populations.

Judge Todd does not appear to have applied the sentencing guidelines in a mandatory fashion. Instead, as outlined above, he considered the factors required by statute under Section 3553(a). The sentence imposed was therefore reasonable.

For the foregoing reasons, we **AFFIRM** the district court's judgment and sentence.

## UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Leonard Green
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: January 15, 2008

Mr. Randolph W. Alden
Office of the Federal Public Defender
for the Western District of Tennessee
200 Jefferson Avenue
Suite 200
Memphis, TN 38103-0000

Re: No. 06-6526, *USA v. Crocker*
Originating Case No. 04-10097

Dear Counsel,

The Court issued the enclosed opinion today in this appeal.

Sincerely yours,

s/Audrey Crockett
Case Manager
Direct Dial No. 513-564-7032
Fax No. 513-564-7094
CA06-Team3@ca6.uscourts.gov

cc: Mr. Frederick H. Godwin
    Mr. Thomas M. Gould
    Honorable George C. Steeh
    Honorable James D. Todd